# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

RACHEL O'DONNELL,

      Plaintiff,

      v.

BH MEDIA GROUP, INC.,

      Defendant.

Civil No. 16-5192 (RMB/AMD)

**OPINION**

APPEARANCES:

SWARTZ SWIDLER, LLC
By:  Daniel A. Horowitz, Esq.
1101 North Kings Highway, Suite 402
Cherry Hill, New Jersey 08034
        *Attorneys for Plaintiff*

JACKSON LEWIS P.C.
By:  John K. Bennett, Esq.
    R. Shane Kagan, Esq.
220 Headquarters Plaza, East Tower, 7th Floor
Morristown, New Jersey 07960
        *Attorneys for Defendant*

**BUMB**, UNITED STATES DISTRICT JUDGE:

Plaintiff Rachel O'Donnell asserts that her former employer, Defendant BH Media Group, Inc., doing business as the Press of Atlantic City, violated her rights under the Family Medical Leave Act, "FMLA," 29 U.S.C. § 2601 et seq., and New Jersey law, when it allegedly failed to properly apprise her of

1

her rights to leave time before and after the birth of her child, and then allegedly pretextually eliminated her position while she was on maternity leave.[1]

Defendant moves for summary judgment.  For the reasons stated herein, the motion will be granted in part and denied in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  <u>The leave time taken by O'Donnell</u>

By the time Plaintiff Rachel O'Donnell became pregnant with her second child in late 2013, she had been employed by Defendant, the Press of Atlantic City, for five years. (Defendant's Statement of Undisputed Material Facts, "DSUMF," ¶¶ 9, 12, 24)  At the time, she was working full-time as one of two Circulation Sales Executives in the Circulation Department. (DSUMF ¶ 10)  O'Donnell's projected due date was June 17, 2014. (DSUMF ¶ 42)

On Thursday, February 20, and Friday, February 21, 2014, O'Donnell took two days off from work because her father was undergoing surgery.  (DSUMF ¶ 14)  The next day, Saturday, O'Donnell went to AtlantiCare Behavioral Health complaining of extreme anxiety.  (DSUMF ¶ 16)  On Monday, O'Donnell returned to

---

[1]   The Court exercises federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

AtlantiCare and spoke with a social worker; she did not go to work that day. (DSUMF ¶ 17-19) O'Donnell also did not go to work on Tuesday, February 25, because she returned to AtlantiCare to be evaluated by a psychiatrist. (DSUMF ¶ 20) O'Donnell's primary care physician faxed a doctor's note to Defendant stating that O'Donnell would be able to return to work on Friday, February 28, 2014. (DSUMF ¶ 22) In response, Nancy Sonnie, Defendant's Payroll and Human Resources Administrator, sent O'Donnell a letter confirming that O'Donnell's leave "beginning on February 24, 2014" was FMLA leave. (Def. Ex. 3) On February 26, 2014, O'Donnell's psychiatrist faxed a doctor's note to Defendant stating,

> This is to confirm that Rachel Odonnell [sic] is currently engaged in Adult Intervention Services with AtlantiCare since 02/22/14. Ms. Odonnell [sic] was seen by me today— 02/25/14. She is unable to work due to illness. Her expected date of return to work is 03/17/14.

(Def. Ex. 3)

The following week, on March 4, 2014, while O'Donnell was still out on FMLA leave, she emailed Sonnie. (Def. Ex. 3) The email's subject line was "Maternity benefits." (Id.) O'Donnell inquired, "Nancy, my doctor wanted me to ask you if me filling out the FMLA forms now and the disability I am [sic] now will affect my maternity disability. I don't think so but he wanted me to follow up with you on it." (Id.) Minutes later, Sonnie

responded by email, "[y]ou are using the FMLA protection now, so you would have less when you went out on maternity. But for the job protection you have to fill it out now and then." (Id.) Minutes after that, O'Donnell further questioned, "[b]ut I am still entitled to the maternity benefits of 4 weeks before and 8 weeks after regardless right? FMLA after that will depend on how many weeks I have left from my disability now? If that makes sense?" (Id.)[2] Minutes after that, Sonnie responded:

> You can be out a total of 6 months under disability so yes you should be fine there.
>
> FMLA you get a total of 60 business days of job protection, so you are using some now, and you will use some later.
>
> Then if you wanted you could take an additional 12 weeks to care for the baby.
>
> You are using the piece that we supplement (11 weeks), so you won't have as much when you go out on maternity.
>
> Hope this helps.

(Id.)

On March 14, 2014, O'Donnell's psychiatrist faxed Defendant a doctor's note extending her leave to April 30, 2014. (Def. Ex. 3) Thereafter, on April 22, 2014, O'Donnell's obstetrician

---

[2] O'Donnell had worked with Sonnie to coordinate O'Donnell's maternity leave after the birth of her first child. (DSUMF ¶ 24)

provided a note stating that O'Donnell "will be out of work until after delivery of child." (Id.)[3]

O'Donnell gave birth on her due date, June 17, 2014. (DSUMF ¶ 47) Thereafter, O'Donnell provided Defendant a doctor's note stating that O'Donnell had delivered by cesarean section and "will be able to return to work without restrictions 8/12/14." (Pl. Ex. M)[4]

On July 1, 2014, O'Donnell emailed Nancy Sonnie to tell Defendant that she planned on returning to work on Monday, August 11, 2014. (Pl's Ex. BB)

## B. Events at The Press of Atlantic City while O'Donnell was on Leave

On Friday, March 28, 2014, a little over a month after O'Donnell began her FMLA leave, Danielle Daly, Director of Human Resources at the Press of Atlantic City, emailed an HR representative at Defendant's headquarters and copied Nancy Sonnie. The email's "Subject" was "FMLA issue." (Pl. Ex. N) The email stated:

> Hi Roshelle— we have an FMLA/term situation want to get your feedback on:
>
> Rachel O'Donnell works in Cir as a Sales Executive. She's pregnant & due in mid-June. Her plan is to stay out of work until after the baby arrives.

---

[3] April 22, 2014 was exactly eight weeks before O'Donnell's due date of June 17, 2014.

[4] August 12, 2014 was exactly eight weeks after O'Donnell's delivery date of June 17, 2014.

- She's been out on STD since 2/24/14 on mental health issue

- Her current RTW date is 4/30 (but we don't anticipate her returning until after the baby is born)

- Her FMLA will end on 5/16 if she doesn't return on 4/30. If she returns on 4/30 then she'll have 12 days remaining of FMLA protection.

- Once the baby arrives she's eligible for 12 weeks of job protection under NJFLA to care for the baby. The department has been struggling to get the work done. She is one of two people in this position (the other person was just hired on 3/24/14).

What are your thoughts on terminating her employment once her FMLA ends?

(Pl. Ex. N)

The following Monday, April 2, 2014, approval was given to temporarily place Jessica Harvard in O'Donnell's position, effective April 15, 2014. (Pl's Ex. O) Defendant's "Employee Status Change Form" indicates that Harvard's "new business title" was "Circulation Sales Executive (temp)" and that the "Person Replaced" was "Rachel O'Donnell— currently out on leave." (Id.)

Then, a week later, on April 22, 2014-- the same day Nancy Sonnie received O'Donnell's obstetrician's note stating that O'Donnell would be out of work through her delivery-- Defendant again internally discussed O'Donnell's situation. Mark Blum, the Publisher of the Press of Atlantic City inquired of Daly, via email, "[s]o can [O'Donnell's] position be replaced since

we're talking about sometime in September before she comes back?" (Pl. Ex. P)  Daly responded by writing the following email to Roshelle at corporate headquarters, and copying Blum:

Hi Roshelle—

Rachel O'Donnell who's out on a mental illness (we discussed this on 3/28).  She's now out on maternity leave, see [doctor's] note below.  Her FMLA will expire on 5/15.  Her tentative delivery date is 6/17/14.

She would get at least 8 weeks of disability (depending on complications) after the baby is born.  Then she has the option of taking NJFLA (the NJFLA doesn't start until after she's released from her disability) for up to an additional 12 weeks to bond with the baby, this could be anywhere from 8/12-11/4.

From 5/15 to 8/12 she will have no job protection under FMLA/NJFLA.  What's your opinion about terminating her employment so we can replace her position?

(Pl. Ex. P)

On May 22, 2014, one week after O'Donnell's FMLA leave time had been exhausted, Defendant posted a job opening for "Circulation Department Sales Executive." (Pl. Ex. Q)  The posting was removed one week later. (Id.)  There is no evidence in the record that anyone was hired for the posted position.

Around this time, the Director of the Circulation Department proposed to Publisher Blum four main staffing changes in the Circulation Department. (Def. Ex. 11)[5]  Three of the four

---

[5] Exhibit 11 is an email dated June 20, 2014 attaching the "latest revision" of the proposed changes.  Relying on the fact that the document is identified as a "revision," Defendant draws the reasonable inference that the changes must have been

changes proposed moving or hiring individual people.  (Id.)  The

fourth, and most relevant, proposed change, effective July 1,

2014, was:

4.  **Replace the open circulation sales executive position with 2 FT lower paid sales reps.** Currently we have a FT opening which is Rachel O'Donnell's position (HD sales Executive). The salary for this position is $38k plus commission. Jessica Harvard, PT kiosk sales associate was move to a temp FT position in Rachel's absence. Jessica is at $10.00/hour plus commission. We also moved a PT CSR from the phones to assist Jessica with kiosk sales.

   The proposed plan is move the CSR back to customer service and to create an additional FT sales position on the heels of our great success in testing the "employee kiosk sales" concept.

   Jessica Harvard would move from temporary to regular as a Circulation Sales Executive with a salary of $24k plus her current commission plan. She will have the same duties that Rachel O'Donnell had. We would change the current part time position to a full time position with an annual salary of $21k plus commission.

   The incremental expense of this change will be $3,800, but the incremental revenue will be $16,800 based on current sales made by Jessica.

These changes would align our resources more efficiently and help increase sales. We are in the process of changing the culture within the circulation department and will no longer settle for mediocrity. The changes outlined above will place the right people in the right areas.

(Id.)

     In August, just before O'Donnell was to return to work,

Daly offered O'Donnell two positions which were different from

her previous position.  (Def. Ex. 3)  Both positions carried a

base salary which was $13,000 less than the base salary

O'Donnell earned before taking leave.  (Id.)  On August 11,

2014, the day O'Donnell was to return from leave, O'Donnell

emailed Daly to decline the offers.  (Id.)  O'Donnell wrote, in

---

proposed before June 20, 2014.  There is no evidence in the
record, however, from which to infer how long before "June 20,
2014 at 12:10:42 PM EDT" the changes were originally proposed.

relevant part, "[t]he simple fact is that the positions being offered consist of a lower base salary than my previous position and with the economy being as unstable as it is, these advertising positions would not support my household expenditures nor the childcare costs of me working." (Id.)

In response, Publisher Blum emailed O'Donnell to offer her a position with a $35,000 base salary plus commissions, stating that this new offer "would get [O'Donnell] very close to [her] previous base pay." (Def. Ex. 3) O'Donnell declined the position. (Id.) This lawsuit followed.

**C. Counts of the Complaint**

The Complaint asserts six counts: (1) interference with Plaintiff's leave rights in violation of the New Jersey Family Leave Act, N.J.S.A. 34:11B-9(a), "NJFLA"; (2) retaliation against Plaintiff for attempting to invoke her NJFLA rights; (3) retaliation in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq.,"NJLAD"; (4) disability discrimination in violation of NJLAD; (5) retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 et seq., "FMLA"; and (6) interference with Plaintiff's leave rights in violation of the FMLA.

In response to Defendant's Motion for Summary Judgment, Plaintiff states that she "withdraws her claim for interference under the FMLA." (Opposition Brief, p. 2, n.2) Accordingly,

Count Six will be dismissed pursuant to Fed. R. Civ. P.
41(a)(2).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  A fact is "material" if it will "affect the
outcome of the suit under the governing law[.]"  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is
"genuine" if it could lead a "reasonable jury [to] return a
verdict for the nonmoving party."  Id.

In determining the existence of a genuine dispute of
material fact, a court's role is not to weigh the evidence; all
reasonable "inferences, doubts, and issues of credibility should
be resolved against the moving party."  Meyer v. Riegel Prods.
Corps., 720 F.2d 303, 307 n. 2 (3d Cir. 1983).  However, a mere
"scintilla of evidence," without more, will not give rise to a
genuine dispute for trial.  Anderson, 477 U.S. at 252.
Moreover, a court need not adopt the version of facts asserted
by the nonmoving party if those facts are "utterly discredited
by the record [so] that no reasonable jury" could believe them.
Scott v. Harris, 550 U.S. 372, 380 (2007).  In the face of such
evidence, summary judgment is still appropriate "where the
record . . . could not lead a rational trier of fact to find for

the nonmoving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)). In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord* *Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")).

## III. ANALYSIS

### A. <u>Failure to provide FLA notice / inaccurate notice</u>

In Count One, O'Donnell asserts that "Defendant interfered with Plaintiff's rights under the NJFLA by failing to provide her with notice of her rights under the NJFLA." (Compl. ¶ 48) O'Donnell's opposition brief elaborates, "Defendant interfered with Plaintiff's [NJFLA] rights by [(1)] failing to provide Plaintiff with individualized written notice of her [NJFLA] rights and [(2)] providing inaccurate information to Plaintiff about her [] leave rights" in the March 4, 2014 email from Sonnie. (Def. Ex. 3)

The statute provides, "[a]n employer shall display conspicuous notice of its employees' rights and obligations pursuant to the provisions of this act, and use other appropriate means to keep its employees so informed." N.J.S.A. 34:11B-6. New Jersey regulation further provides,

> (a) Employers covered under the Act shall display the official Family Leave Act poster of the Division on Civil Rights in accordance with N.J.A.C. 13:8-2.2. The poster is available for printing from the Division's website, www.njcivilrights.gov.
>
> (b) If an employer covered under the Act maintains written guidance to employees concerning employee benefits or leave rights, such as in an employee handbook, information concerning leave under the Act and employee obligations under the Act must be included in the handbook or other document. If an employer does not have written policies, manuals, or handbooks describing employee benefits and leave provisions, the employer shall provide written guidance to each of its employees

concerning all the employee's rights and obligations
under the Act.  Employers may duplicate and provide its
employees a copy of the NJFLA Fact Sheet available on
the Division's website, www.njcivilrights.gov, to
provide such guidance.

N.J.A.C. 13:14-1.14.[6]

(1)  <u>Failure to provide notice</u>

O'Donnell's employee handbook contains an extensive and

detailed five-page explanation of "family and medical leave"

under federal law.  (Def. Ex. 4)  At the end of the section

pertaining to FMLA leave, the handbook further provides,

<u>Interaction with State Leave Laws</u>
Certain states require employers to provide greater or different job-protected leave. When applicable, the
Company complies with all such leave laws. When leave provided under one of these laws is covered under the
federal FMLA, it also shall count toward the employee's federal FMLA leave entitlement and as FMLA leave
under this policy.  These leave laws vary by state, and employees should contact Human Resources with any
questions.

(Id.)

O'Donnell maintains that this notice is legally deficient

on its face because it fails to "include[] in the handbook"

"information concerning leave under the [NJFLA] and employee

obligations under the [NJFLA]."  N.J.A.C. 13:14-1.14.  Defendant

counters that it "is a nation-wide company and, thus, its

---

[6]  This portion of the regulation was amended, effective
September 2, 2014, to add the Division's website address, but
the substance of the regulation was not changed.  2014 NJ Reg
Text 356681 (NS), 46 N.J.R.583(a).

provisions regarding 'Interaction with State Leave Laws' in its handbook are entirely appropriate."  (Reply Brief, p. 4)

The issue is whether directing employees, in writing, in the employee handbook, to contact their Human Resources representative concerning their possible entitlement to state law leave is insufficient notice under the NJFLA.  The Court does not need to decide this issue, however, because even if the notice in O'Donnell's employee handbook was sufficient, there are issues of disputed fact concerning whether Defendant's Human Resources Department gave O'Donnell complete and accurate information concerning her NJFLA leave.

(2) <u>Inaccuracy of notice</u>

O'Donnell contends that the March 4, 2014 email, wherein Sonnie attempted to explain all the types of leave to which O'Donnell was entitled, was both insufficient and inaccurate. O'Donnell asserts the email was insufficient because it did not explain that the "additional 12 weeks" of leave was NJFLA leave which includes job protection[7]; and she contends the email was

---

[7]  <u>See</u> N.J.S.A. 34:11B-4 ("An employee of an employer in this State . . . shall be entitled to a family leave of 12 weeks in any 24-month period upon advance notice to the employer."); N.J.A.C. 13:14-1.11(a) ("Upon the expiration of a family leave, an employee shall be restored to the position such employee held immediately prior to the commencement of the leave.  If such position has been filled, the employer shall reinstate such employee to an equivalent position of like seniority, status, employment benefits, pay, and other terms and conditions of employment.").

inaccurate because it suggested that O'Donnell could take NJFLA leave only after taking family temporary disability leave pursuant to N.J.S.A. 43:21-27(o).[8]

Defendant responds that O'Donnell "neither requested nor wanted NJFLA leave," and asserts that O'Donnell's March 4 email exchange with Sonnie concerned only maternity temporary disability leave. (Reply Br. p. 5) This argument, however, is not based on a reading of the record in the light most favorable to O'Donnell. A reasonable factfinder could find that O'Donnell was inquiring about her maternity leave generally, not just disability leave; she inquired about both "maternity disability" and "maternity benefits." (Def. Ex. 3) Moreover, the fact that Sonnie responded to O'Donnell's inquiry by providing information concerning NJFLA leave supports an inference that Sonnie understood O'Donnell to be inquiring about maternity leave generally. (Id.) Therefore, contrary to Defendant's argument,

---

[8] Both NJFLA leave and family temporary disability leave may be taken any time within a year of the birth of a child. N.J.S.A. 34:11B-4(c); N.J.S.A. 43:21-27(o)(2). N.J.A.C. 13:14-1.6(a) provides that "leave for a reason covered by both [statutes]" runs concurrently, but an employer may choose to adopt a more generous leave policy by counting the leaves consecutively. See In re Madison Bd. of Educ., 2016 WL 2596521, at *3 (App. Div. 2016) ("The coordination of [the employee's] use of FMLA and NJFLA leave time for the care of her child is not preempted by N.J.A.C. 13:14-1.6(a) because N.J.S.A. 34:11B-14 provides the [employer] with discretion to provide a leave benefit greater than the concurrent use of NJFLA and FMLA leave time otherwise required under the regulation.").

a reasonable juror could find that O'Donnell wanted to know about all leave to which she may be entitled in connection with the birth of her child.

Similarly, Defendants' assertion that O'Donnell was not prejudiced by any alleged omission or inaccuracy in Sonnie's email because O'Donnell "admitted that she did not want additional time off pursuant to the NJFLA" (Reply Brief, p. 6), is also not based on a reading of the record favorable to O'Donnell.  O'Donnell testified at her deposition:

> Q:  Did you request additional time off in 2014 to care for your newborn son []?
>
> A:  No.
>
> Q:  And was that a decision on your part not to request that?
>
> A:  Yes.
>
> Q:  And why was it that you made the decision not to extend the August 12, 2014 return date . . . ?
>
> A:  Because I wanted to go back to work.

(O'Donnell Dep. p. 189-90)  A reasonable factfinder could find, as O'Donnell asserts, that the reason (or a reason) O'Donnell "wanted to go back to work" was because she did not know-- based on allegedly incorrect information provided to her by Defendant-- that she had additional NJFLA leave to take that would be job protected leave.  (See Opposition Brief, p. 8, 10)  In other words, the record, viewed in the light most favorable to

O'Donnell, does not support the inference that O'Donnell would not have taken additional NJFLA leave even if Defendant had clearly offered to extend her leave date past August 11, 2014.

Accordingly, Defendant's Motion for Summary Judgment as to the NJFLA notice claim asserted in Count One of the Complaint will be denied.

## B. **NJFLA interference**

O'Donnell asserts that "Defendant's failure to designate [O'Donnell's] absences following the birth of her child on June 17, 2014 as FLA protected or offer protected FLA leave . . . constitutes FLA interference." (Opposition Brief, p. 11) The statute provides, "[i]t shall be unlawful for any employer to interfere with, restrain or deny the exercise of, or the attempt to exercise, the rights provided under this act or to withhold the benefits provided for under this act." N.J.S.A. 34:11B-9. Thus, O'Donnell apparently asserts that by failing to designate her post-birth leave as NJFLA leave, Defendant either interfered with her NJFLA rights, or withheld the benefits to which she was entitled under the NJFLA.

Defendant asserts that O'Donnell's NJFLA interference claim fails because O'Donnell "neither requested nor wanted NJFLA leave." (Reply Brief, p. 5, 6) As discussed above, this argument fails. A reasonable juror could find that had

Defendant fully and accurately explained to O'Donnell her leave rights under the NJFLA, she would have asked Defendant to designate all of her post-birth leave time as NJFLA leave.

Accordingly, Defendant's Motion for Summary Judgment as to the NJFLA interference claim asserted in Count One of the Complaint will be denied.

## C. NJLAD discrimination

O'Donnell's theory supporting her NJLAD discrimination (as opposed to retaliation) claim, or claims, is somewhat muddled. Counts Three and Four of the Complaint both assert claims for disability discrimination in violation of NJLAD, and in her opposition brief O'Donnell states, "Plaintiff claims she was replaced because of her disability and/or for requesting an accommodation for her disability." (Opposition Brief, p. 15)

The Court begins from the basic premise that there are "two distinct categories of [NJLAD] discrimination claims": "failure to accommodate" and "disparate treatment discrimination." Victor v. State, 401 N.J. Super. 596, 610 (App. Div. 2008), aff'd by 203 N.J. 383 (2010). The Court addresses each category in turn.

O'Donnell correctly observes that, under NJLAD, a leave of absence can be an accommodation for a disability,[9] however, it is also undisputed that Defendant granted O'Donnell leave. As such, the summary judgment record does not support a *failure* to accommodate claim, as opposed to a retaliation claim for actually using the requested accommodation, which will be discussed later in this Opinion.

Similarly, the summary judgment record also does not support a disparate treatment claim because there is insufficient record evidence to support a factual finding that Defendant constructively discharged O'Donnell, or took any other adverse employment action against O'Donnell, *because of her disabilities*. The record is devoid of any evidence that Defendant held hostility towards, or a negative view of, O'Donnell's mental illness, pregnancy, or pregnancy-related conditions. While Defendant's internal email communications evidence a concern about how much leave O'Donnell had taken, or was expected to take, those emails do not reflect any negative view as to why that leave was taken.

---

[9] See N.J.A.C. 13:13-2.5(b)(1) ("Under circumstances where such accommodation will not impose an undue hardship on the operation of an employer's business, examples of reasonable accommodation may include: . . . part-time or modified work schedules or leaves of absence").

Accordingly, Defendant's Motion for Summary Judgment as to the NJLAD discrimination claims asserted in Counts Three and Four of the Complaint will be granted.

**D. FMLA Retaliation**

O'Donnell asserts that Defendant took adverse employment actions against her in retaliation for taking leave in violation of the FMLA. This claim is analyzed using the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) framework. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012).

Under the FMLA, to establish a prima facie case of retaliation, O'Donnell must establish that Defendant "use[d]" her exercise of FMLA rights (i.e., taking FMLA leave) as a "negative factor," in taking "employment actions" with respect to O'Donnell. 29 C.F.R. § 825.220(c).[10] O'Donnell asserts that her "FMLA protected leave of absence was a motivating factor in Defendant's decision . . . to include [O'Donnell] in a reduction in force." (Opposition Brief, p. 25)[11]

---

[10] See generally, Eagan v. Delaware River Port Authority, 851 F.3d 263, 272 (3d Cir. 2017) (affording *Chevron* deference to § 825.220(c), which "precludes an employer from placing negative weight on the use of FMLA leave when making an employment decision.").

[11] O'Donnell's Complaint and Opposition Brief are not entirely clear as to the adverse employment actions, if any other than the reduction in force, supporting her retaliation claims. For example, O'Donnell seems to assert that Defendant took an adverse employment action against her when it allegedly attempted to replace O'Donnell after her FMLA leave expired.

Defendant's internal emails concerning O'Donnell's FMLA leave are sufficient evidence that Defendant had a negative view of O'Donnell taking FMLA leave. This evidence, coupled with the timing of Defendant's restructuring of O'Donnell's department which effectively eliminated O'Donnell's position, supports a reasonable inference that Defendant used O'Donnell's use of FMLA leave as a negative factor in making the restructuring decision.

In moving for summary judgment, Defendant argues that because O'Donnell's FMLA leave had been exhausted, she had no right to reinstatement to her prior position, and therefore her FMLA retaliation claim fails. This argument confuses FMLA interference claims with FMLA retaliation claims. While Defendant is correct that once O'Donnell had exhausted her FMLA leave, Defendant had no affirmative duty to hold open O'Donnell's position, or an equivalent position, Defendant nevertheless had an independent duty to refrain from considering O'Donnell's FMLA leave as a negative factor when making

---

(Opposition Brief, p. 25) While evidence of such an attempt may be probative of Defendant's asserted retaliatory intent, the Court expresses doubt that such an "attempt" is an independently actionable adverse employment action, insofar as it does not appear from the record that the attempt had any effect on the terms or conditions of O'Donnell's employment.

Moreover, it is not clear whether O'Donnell also asserts that Defendant's asserted failure to designate her post-childbirth leave as NJFLA leave is, in addition to being a stand-alone claim, an allegedly retaliatory action resulting from O'Donnell taking FMLA leave.

employment decisions which affected O'Donnell.  By withdrawing

her claim for FMLA interference, O'Donnell has made clear that

she is only proceeding on the latter legal theory of liability--

that irrespective of her statutory entitlement to reinstatement,

Defendant retaliated against her for taking FMLA leave, in

violation of the FMLA.

The Court holds that the summary judgment record

sufficiently establishes a prima facie case of FMLA retaliation.

While Defendant proffers the restructuring of O'Donnell's

department as a non-retaliatory reason for O'Donnell's alleged

constructive discharge[12], a reasonable factfinder could conclude

that the reason is pretextual.  The record evidence--

particularly Defendant's internal emails concerning O'Donnell's

leave-- is sufficient to support a finding that the true reason

for the adverse employment actions taken against O'Donnell was

O'Donnell's use of FMLA leave.  In particular, Daly's question

posed to Human Resources shortly after O'Donnell began her FMLA

leave-- "[w]hat are your thoughts on terminating her employment

once her FMLA ends?"-- is alone sufficient evidence, when

construed in O'Donnell's favor, that Defendant had retaliatory

---

[12]  Defendant proffers no reason for its alleged failure to
designate O'Donnell's post-childbirth leave as NJFLA leave,
although as the Court has already observed, it is not clear
whether O'Donnell asserts that the failure to designate was in
retaliation for O'Donnell taking FMLA leave.

motives.  The fact that Defendant's own internal emails use the words "termination" and "job protection" when discussing O'Donnell's leave "situation," when construed in O'Donnell's favor, support the inference that the "restructuring" of O'Donnell's department was not a true restructuring, but rather Defendant's attempt to avoid legal liability.  (Pl. Ex. N, P)

Relying on the undisputed evidence that "Defendant sought to retain [O'Donnell] as an employee" (Reply Brief, p. 16), Defendant argues that a reasonable factfinder could not conclude that Defendant held retaliatory animus toward O'Donnell.  The Court disagrees.  Defendant is free to make such an argument to the jury, however, at summary judgment the Court must view the record in the light most favorable to O'Donnell.  In so doing, the Court holds that a reasonable jury could find that Defendant retaliated against O'Donnell even though Defendant undisputedly invited O'Donnell to work in other lower paid positions.

Accordingly, Defendant's Motion for Summary Judgment as to the FMLA retaliation claim asserted in Count Five of the Complaint will be denied.

### E.  <u>NJFLA Retaliation</u>

Defendant moves for summary judgment asserting that "the record facts are clear that [] [O'Donnell] did not take NJFLA leave," therefore, Defendant asserts, O'Donnell cannot establish a prima facie case of NJFLA retaliation. (Reply Brief, p. 9)

The Court finds, however, that the record facts are not clear that O'Donnell did not take NJFLA leave; rather, issues of material fact exist as to whether O'Donnell's post-childbirth leave was family temporary disability leave or NJFLA leave.

The summary judgment record contains no company record which tracks and designates all of the leave O'Donnell took beginning on February 20, 2014 through August 11, 2014. It appears undisputed that O'Donnell used all of her FMLA leave time from February 24, 2014 through May 15, 2014.[13] As to O'Donnell's family temporary disability leave and NJFLA leave, however, there is no evidence as to which leave was taken when (if at all).[14] The record contains Defendant's internal emails which support an inference that one or more of Defendant's Human Resources representatives erroneously believed that O'Donnell must first take family temporary disability leave before taking NJFLA leave, but that evidence is not necessarily irreconcilable

---

[13]  Indeed, as among family temporary disability, NJFLA, and FMLA leave, FMLA leave is the only type of leave an employee may take for her own medical condition. Therefore, O'Donnell's pre-birth leave necessarily must have been FMLA leave.

[14]  The absence of such record evidence is notable. The Court would expect that a large national employer would have an established leave tracking system. Additionally, depending on Defendant's policy concerning whether NJFLA leave is paid or unpaid (the Court has found no record evidence in this regard), payroll records might also reflect what type of leave was taken.

with a finding that O'Donnell took NJFLA leave immediately upon the birth of her child.

Defendant correctly argues that as a legal matter, O'Donnell cannot simultaneously recover on her NJFLA interference claim and her NJFLA retaliation claim-- either Defendant did not give O'Donnell NJFLA leave (which is an interference claim), or Defendant did give her NJFLA leave and then later took adverse employment actions against her in retaliation.  Because the summary judgment record is unclear, however, as to what type of leave O'Donnell was given, a jury must first decide when, if at all, O'Donnell was given NJFLA leave before the Court may decide whether O'Donnell may legally prevail on the NJFLA interference claim or the NJFLA retaliation claim.

Accordingly, Defendant's Motion for Summary Judgment as to the NJFLA retaliation claim asserted in Count Two of the Complaint will be denied.

**F. NJLAD Retaliation**

The Court's analysis of the NJLAD retaliation claim is substantially similar to the Court's analysis of the FMLA retaliation claim.  Like FMLA retaliation claims, NJLAD retaliation claims are analyzed using the McDonnell Douglas burden-shifting framework.  Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546 (2013) ("All LAD claims are evaluated in

accordance with the United States Supreme Court's burden-shifting mechanism."). To establish a prima facie case of retaliation under NJLAD, a plaintiff must demonstrate that she "engaged in a protected activity that was known to the employer," that [she] "was subjected to an adverse employment decision, and there is a causal link between the activity and the adverse action." Id.

In this case, the record evidence demonstrates that O'Donnell engaged in activity protected by NJLAD: she requested, and used, leave as an accommodation for her disabilities. Further, as discussed above, the record evidence establishes at least one adverse employment action: O'Donnell's constructive discharge resulting from the restructuring of her department. Also as discussed above, Defendants' internal emails and the timing of the restructuring support an inference of causation.

Lastly, the Court has explained above why a reasonable factfinder could find that Defendant's restructuring was merely pretext for a retaliatory motive.

Accordingly, Defendant's Motion for Summary Judgment as to the NJLAD retaliation claim asserted in Count Three of the Complaint will be denied.

## G. Punitive Damages

Defendant makes two arguments in favor of striking O'Donnell's claim for punitive damages. First, Defendant

asserts that "punitive damages are not available under the FMLA." (Moving Brief, p. 23) This argument is moot insofar as the FMLA counts of the Complaint do not demand punitive damages.[15]

Second, Defendant argues that the record facts are not sufficiently egregious to support an award of punitive damages. The Court disagrees. Defendant's internal emails, particularly Plaintiff's Ex. N, viewed in the light most favorable to O'Donnell, could support a finding that Defendant was looking for a window of time between O'Donnell's FMLA job protected leave and her NJFLA job protected leave to "terminate" O'Donnell in blatant disregard for her leave rights, and her right to a reasonable accommodation under the NJLAD. On the other hand, there is also record evidence from which a jury could reasonably find that Defendant's restructuring decision was not motivated by O'Donnell taking leave, but rather, as stated in the

---

[15] O'Donnell's opposition brief implicitly confirms that she does not seek punitive damages under the FMLA; the brief only addresses the availability of punitive damages under NJLAD and NJFLA. (Opposition Brief p. 29-30)

The Court also observes that while punitive damages are not available under the FMLA, "liquidated damages," in addition to lost compensation and interest thereon, are available under the FMLA. 29 U.S.C. § 2617(a)(1)(A)(iii); see generally Smith v. AS Am., Inc., 829 F.3d 616, 623 (8th Cir. 2016) ("The FMLA statute states that an employer who violates the FMLA 'shall be liable to any eligible employee affected' for lost wages, interest, and 'an additional amount of liquidated damages equal to the sum of the amount' of lost wages and interest.")(quoting 29 U.S.C. § 2617(a)(1)(A)(iii); emphasis in Smith).

restructuring plan, a desire to "align [] resources more efficiently and help increase [] sales." (Def. Ex. 11)

Accordingly, the Court declines to decide the punitive damages issue at this stage of the case. If this case proceeds to trial, and a verdict is returned for O'Donnell, at that time the Court will decide whether to submit the issue of punitive damages to the jury.

## IV. CONCLUSION

For the foregoing reasons, Count Six of the Complaint (the FMLA interference count) will be dismissed pursuant to Fed. R. Civ. P. 41(a)(2), and Defendant's Motion for Summary Judgment will be granted as to the NJLAD discrimination claims and denied in all other respects, except that the Court reserves decision on the punitive damages issue at this time. An appropriate Order shall issue on this date.


                                        s/ Renée Marie Bumb
Dated: May 24, 2018                     _____
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE